802 F.2d 456
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
C. B. BYRGE, NORMAN D. AUGSPURGER, and SCORPIO, INC.,
Plaintiffs-Appellants
v.
RBS, INC., and Ohio Corporation, Defendant-Appellee.
 No. 85-5466.
 United States Court of Appeals, Sixth Circuit.
 Aug. 1, 1986.
 
 Before: ENGEL, CONTIE and RYAN, Circuit Judges.
 PER CURIAM.
 
 
 1
 This case involves a breach of contract dispute arising out of the lease of a coal tipple in Clay County, Kentucky. The trial court, in a bench trial, awarded damages for plaintiffs-appellants C. B. Byrge, Norman D. Augspurger and Scorpio, Inc. (Scorpio) and against RBS, Inc. in the amount of $24,751.80, and for defendant-appellee RBS, Inc. (RBS) and against Scorpio in the amount of $75,166.66. The result, after set-off, was an award of damages against Scorpio in the amount of $50,414.86. This appeal followed.
 
 
 2
 Scorpio asserts only errors of fact, therefore our review is governed by the "clearly erroneous" standard of Fed. R. Civ. P. 52(a). Since we hold that the factual findings alleged to be in error are not clearly erroneous, we affirm the judgment of the district court.
 
 
 3
 On August 1, 1975, Scorpio leased to RBS a coal tipple, the land on which the tipple was located, and all fixtures and equipment on the land. Coal was trucked to the tipple, crushed, and then loaded onto railroad freight cars.
 
 
 4
 The terms of the August, 1975 lease obligated RBS to pay rent to Scorpio in the amount of 10% of net sales up to $2,000,000.00, and 5% of net sales over $2,000,000.00. The minimum annual rent was $120,000.00. The "percentage of net sales" calculation of rent applied only to net sales of coal by rail. Rent generated by net rail car sales in excess of $2,000,000.00 was to be retained by RBS and applied against the cost of installing equipment on the leased land. Scorpio acquired title in any equipment purchased by RBS with retained rent.
 
 
 5
 A modification to the lease dated March 29, 1976, provided that RBS would pay Scorpio $1.00 for every truck load of coal processed at the tipple that was sold. No rents were payable on coal shipped by truck that was not processed at the tipple.
 
 
 6
 On August 1, 1976, the original lease was cancelled, and a new lease was executed. The new lease obligated RBS to pay Scorpio $60,000.00 a year in rent, payable in monthly installments of $5,000.00. In addition, RBS was obligated to pay Scorpio fifty cents for every ton of coal processed in excess of 120,000 tons per year.
 
 
 7
 The second lease was modified in August of 1977 to provide that yearly rentals would be $90,000.00, payable in monthly installments of $7,500.00, with an additional fifty cents per ton due on all coal processed at the tipple in excess of 120,000 tons per year. The modification also provided that Scorpio had the option to purchase any equipment installed on the leased premises, on the basis of a fair market appraisal.
 
 
 8
 Throughout the course of dealings between Scorpio and RBS, the lease in force provided that RBS would retain title to any improvements it made on the land, unless they were the property of Scorpio by application of the 5% rental withholding; that RBS would maintain insurance in favor of Scorpio on the property leased; and that at the end of the lease RBS would return the leased premises, including all equipment and machines thereon, in the condition found at the time the lease was entered into, less normal wear and tear.
 
 
 9
 Scorpio claims that the district court erred in its calculation of additional rents due from RBS for coal shipped by truck during the first year RBS operated the tipple. The district court concluded that railroad records Scorpio introduced into evidence indicated RBS had significantly under-reported the amount of coal it shipped by rail during the first year it operated the tipple. Since rents the first year of the lease were based on a percentage of sales in dollars, the underreporting cost Scorpio rents it was due.
 
 
 10
 Scorpio claims further that RBS also underreported the amount of coal it shipped by truck. Although it was able to document the underreporting of the train-shipped coal, Scorpio could not offer evidence, other than its own assertions, that the amount RBS actually shipped by truck differed from the amount it reported was shipped. Since there was evidence to support both claims, albeit testimonial and not documentary, the district court's finding that no additional rents were due on truck-shipped coal is not clearly erroneous.
 
 
 11
 Scorpio next claims that the district court erred when it allowed RBS a credit against Scorpio for the cost of building a new access road to the tipple. The access road in existence in 1976 was later padlocked by its owner, which forced RBS to build a new road. RBS produced a cancelled check at trial in the amount of $25,000.00, paid to an RBS-related corporation, which RBS president, Roy Schweitzer, asserted was part payment for the cost of building the road. The district court accepted this amount, and granted RBS a set-off of $25,000.00. Scorpio argues that the documentary evidence of RBS' expenses was insufficient; that the claim for the road-building expenses was not made until after this lawsuit was filed and therefore it was unreasonable for the district judge to award $25,000 to RBS.
 
 
 12
 Our standard of review, however, is not whether the evidence in support of the factual finding made by the trial court would have been persuasive to us, but whether it was clearly erroneous. Based on the cancelled check, the testimony of Roy Schweitzer, president of RBS, and the absence of contradictory evidence, we cannot conclude the district judge's findings of fact were clearly erroneous on this point.
 
 
 13
 Scorpio's final claim is that the district court erred in denying Scorpio's damage claim for items leased to RBS which were destroyed by fire. RBS was obligated under the lease to maintain insurance in favor of Scorpio on all of the leased property and to return to Scorpio all the leased property in the condition it was at the time the lease was entered into, less normal wear and tear. Scorpio argues that, in violation of the lease agreement, RBS failed to return either the property it leased or the insurance proceeds RBS recovered when the part of the property leased was destroyed by fire.
 
 
 14
 There were two fires on the leased property. Scorpio was paid the full amount of insurance proceeds for the first fire, $16,450.00, and RBS paid the expenses of putting the tipple back into working order. After the second fire, RBS retained the insurance proceeds of $6,500.00. The insurance proceeds for the first fire were not received by RBS until after the second fire.
 
 
 15
 There was testimony that the first check, in the amount of $16,450.00, which RBS gave in full to Scorpio, fully compensated Scorpio for its loss in both fires. Therefore, the district court's refusal to award Scorpio additional damages for property destroyed in the second fire was not clearly erroneous.
 
 
 16
 For all of the foregoing reasons, the judgment of the district court is affirmed.